*Formatted for Electronic Distribution*  *Not For Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

Filed & Entered
On Docket
01/19/2021

_____

**In re:**
    **Sterling F. Richardson,**                                    **Chapter 7**
          **Debtor.**                                              **Case # 19-10525**
_____

**In re:**
    **Kelly L. Richardson,**                                      **Chapter 7**
          **Debtor.**                                              **Case # 19-10526**
_____

| *Appearances:* | David W. Lynch, Esq. | Ryan M. Long, Esq. |
|---|---|---|
| | Kohn Rath Danon Lynch & Scharf LLC | Primmer Piper Eggleston & Cramer PC |
| | Williston, VT | Burlington, VT |
| | *For the Debtors* | *For the Gebbies* |

### MEMORANDUM OF DECISION
#### DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT

      Debtors Sterling F. Richardson and Kelly L. Richardson (together, the "Debtors") and Peter and Sandra Gebbie d/b/a Gebbies' Maplehurst Farms (the "Gebbies") (collectively, the "Parties") have filed cross-motions for summary judgment. The Gebbies seek summary judgment sustaining their objections to both Debtors' homestead exemptions, and to Mr. Richardson's tools of the trade exemption for sugaring equipment and an all-terrain vehicle. The Debtors each seek summary judgment overruling the Gebbies' objection to their claimed exemptions.

      For the reasons set forth below, the Court finds there are material facts in dispute with respect to all of the exemptions at issue, and summary judgment is therefore not proper. Accordingly, the Court denies the Parties' cross-motions for summary judgment and will set a trial on the merits.

### JURISDICTION

      This Court has jurisdiction over each of the motions for summary judgment pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Order of Reference entered on June 22, 2012. This a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(B). The Court further finds it has constitutional authority to enter a final judgment in this contested matter.

## PROCEDURAL HISTORY

Mr. Richardson filed his chapter 7 case on December 12, 2019 (case # 19-10525, doc. # 1) and timely filed all schedules and statements on December 24, 2019 (id. at doc. # 6). Ms. Richardson filed her chapter 13 case on December 12, 2019 (case # 19-10526, doc. # 1), and timely filed all schedules and statements on December 24, 2019 (id. at doc. # 6). Her case was converted to chapter 7 effective January 21, 2020 (id. at doc. # 13). On May 14, 2020, the Gebbies filed objections to each Debtor's claimed exemptions (case # 19-10525, doc. # 25; case # 19-10526, doc. # 37; the "Objections"). The Debtors each filed a response in opposition to the Objections (case # 19-10525, doc. # 30; case # 19-10526, doc. # 43).

The Court held a hearing on these matters on June 23, 2020. At the hearing, the Gebbies withdrew the portions of their Objections based on the Debtors' wild card exemptions. On the same date, the Court entered a joint scheduling order continuing the hearing and directing the parties to file a joint statement (i) specifying both the stipulated material facts and the material facts in dispute, (ii) stating whether the parties had resolved any additional portions of the Objections, and (iii) specifically identifying the portions of the Objections that were still outstanding (case # 19-10525, doc. # 31; case # 19-10526, doc. # 47). On July 13, 2020, the Parties filed a joint statement stipulating to undisputed and disputed material facts and clarifying the outstanding portions of the Objections (case # 19-10525, doc. # 35; case # 19-105256, doc. # 51). The Court held a continued hearing on July 17, 2020, and entered a second joint scheduling order setting a limited discovery schedule and a briefing schedule on the Gebbies' remaining Objections to each Debtor's exemptions (case # 19-10525, doc. # 40; case # 19-10526, doc. # 55), which the Court subsequently modified at the Parties' request (case # 19-10525, doc. # 61; case # 19-10526, doc. # 74).

On August 21, 2020, the Debtors each filed a motion for summary judgment (case # 19-10525, doc. # 53; case # 19-10526, doc. # 68). On August 28, 2020, the Gebbies filed cross-motions for summary judgment against each of the Debtors (case # 19-10525, doc. # 54; case # 19-10526, doc. # 69). The Parties each filed responses (case # 19-10525, doc. ## 59, 64; case # 19-10526, doc. ## 72, 78), and the Gebbies filed replies (case # 19-10525, doc. # 66; case # 19-10526, doc. # 79).[1] The cross-motions for summary judgment were fully submitted as of October 5, 2020.

## ISSUES PRESENTED

In considering the instant cross-motions for summary judgment, the Court must, as a threshold matter, determine if the undisputed material facts are sufficient to establish whether (i) Mr. Richardson is entitled to his claimed homestead exemption under 27 V.S.A. § 101; (ii) Ms. Richardson is entitled to

---

[1] The Debtors had the opportunity to file replies but did not do so.

2

her claimed homestead exemption under 27 V.S.A. § 101; and (iii) Mr. Richardson is entitled to his claimed tools of the trade exemption under 12 V.S.A. § 2740(2). If the Court finds all the material facts with respect to the allowance of those claimed exemptions are undisputed, it will determine the legal issues of whether these exemptions are properly claimed, and which party is entitled to judgment, as a matter of law.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Jackson v. Fed. Express, 766 F.3d 189, 193–94 (2d Cir. 2014). "A genuine issue exists – and summary judgment is therefore improper – where the evidence is such that a reasonable jury could decide in the non-movant's favor." Brandon v. Kinter, 938 F.3d 21, 31 (2d Cir. 2019) (citation and quotation marks omitted). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted). "The court construes all evidence in the light most favorable to the non-moving party, drawing all inferences and resolving all ambiguities in [that party's] favor." Amore v. Novarro, 624 F.3d 522, 529 (2d Cir. 2010) (citing LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005)); see also Burns v. Martuscello, 890 F.3d 77, 83 (2d Cir. 2018). However, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)).

## UNDISPUTED MATERIAL FACTS

The Court finds the following facts to be undisputed and material to the adjudication of these cross-motions for summary judgment (each, a "UMF"):

*The Debtors' Homestead Exemptions*

1. On or about May 24, 2010, the Debtors took title to the real property located at 5139 Creek Road, Craftsbury Common, Vermont (the "Property"), as joint tenants with right of survivorship (case # 19-10525, doc. # 35, ¶ 14; doc. # 35-2; also filed in case # 19-10526 at doc. # 51).[2]

2. On the same date, the Debtors borrowed $200,000 from a conventional mortgage lender, and Ms. Richardson also contributed $20,000 from her savings and $18,000 that was a gift from her parents, to purchase the Property (case # 19-10525, doc. # 35, ¶ 17; doc. # 35-2).

3. In June 2010, the Debtors began constructing a house on the Property (case # 19-10525, doc. # 35, ¶ 16).

---

[2] Hereafter, citations to the Parties' joint stipulation of facts and exhibits thereto shall refer only to the docket filing number in case # 19-10525.

4. The Debtors both worked on construction of the house, as did Mr. Richardson's father, who donated significant time to the construction project (id. at ¶ 18).

5. The Debtors married in July 2010 and moved into the completed house in December 2010 (id. at ¶ 19).

6. Mr. Richardson worked delivering fuel for Fred's Energy from December 2005 until November 2011, when his father became ill and Mr. Richardson left his job. At that time, the Debtors took over operation of the Richardson family's dairy farm (the "Richardson Farm"), which was located less than a mile from the Property (id. at ¶ 20).

7. Ms. Richardson worked as a loan officer at Yankee Farm Credit from December 2005 until January 2016. During 2016, Ms. Richardson worked full-time at the Richardson Farm (id. at ¶¶ 20–21).

8. In 2016, the Debtors purchased cattle and leased a farm from the Gebbies (the "Gebbie Farm"), which was located eight miles from the Property. Initially, Mr. Richardson and one full-time employee worked at the Gebbie Farm, and Ms. Richardson helped as needed (id. at ¶ 21).

9. In June 2017, Ms. Richardson took over operations at the Gebbie Farm. Mr. Richardson ran the Richardson Farm until November 2018, when he sold the cattle. Mr. Richardson prepared a sugaring operation through winter 2018–19 and began sugaring in spring 2019 (id. at ¶¶ 22, 56).

10. Also in June 2017, due to financial stresses and growing marital tensions, the Debtors decided to divorce; they both remained at the Property, living in different portions of the house (id. at ¶ 23).

11. In November 2017, with few remaining common interests and the certainty of a divorce, Ms. Richardson found it impossible to continue to share the house with Mr. Richardson and vacated the Property. She did not want to leave the Property but found it difficult to cohabit with Mr. Richardson after deciding to divorce him. Ms. Richardson also decided it would be convenient to move closer to the Gebbie Farm, so she and a roommate rented a house about one mile from the Gebbie Farm (id. at ¶¶ 24, 36).

12. In November 2018, Ms. Richardson filed for divorce from Mr. Richardson, and in December 2018 the Vermont Family Court issued a temporary order that provided, inter alia, that "[n]either party may sell ... any real property ... owned by the parties in their joint names ... except by written agreement of both parties" (id. at ¶ 25; doc. # 35-3, p. 6).[3]

13. In November 2018, Ms. Richardson had to give up her shared rental because her roommate left, and she could not afford to pay the full rent. Mr. Richardson remained living at the Property and, as he now had a girlfriend who visited frequently, Ms. Richardson did not want to resume living at the Property with him. For these reasons, Ms. Richardson chose to move into a house at the Gebbie Farm (case # 19-10525, doc. # 35 at ¶ 26).

14. In August 2019, Mr. Richardson had difficulty meeting the mortgage, tax, and insurance expenses for the Property. Ms. Richardson was unable to contribute to the upkeep of the Property as the dairy operation at the Gebbie Farm was losing money. The Debtors agreed to temporarily rent the Property to a childhood friend of Mr. Richardson's who had approached him about needing a rental home. Mr. Richardson did not want to assume the role of landlord, but he was willing to temporarily rent the Property to a trusted friend. The rental income was only enough to pay the mortgage, taxes, and insurance (id. at ¶ 28).

15. In September 2019, Ms. Richardson moved to 210 Coffin Rd., St. Johnsbury, Vt (id. at ¶ 39).

---

[3] Although the Parties state in the joint stipulation of facts that Ms. Richardson filed for divorce in December 2017, this appears to be an error, as the exhibit complaint for divorce is dated November 27, 2018, and the exhibit interim domestic order is dated December 6, 2018 (see doc. # 35-3, pp. 5, 7).

16. As of when the Parties filed their joint stipulation of facts in July 2020, neither of the Debtors lived at the Property. As of that time, Mr. Richardson was residing at 152 Town Forest Rd., Newport, Vermont, with his girlfriend, and Ms. Richardson was residing at 210 Coffin Rd., St. Johnsbury, Vermont, with her boyfriend, Karl Sjolander ("Mr. Sjolander"), with whom she had a son who was then eight months old (id. at ¶¶ 32–33, 39).

17. At no time since vacating the Property in November 2017 has Ms. Richardson lived at the Property (id. at ¶ 37).

18. Mr. Richardson has received, and continues to receive, rental income from the residential tenant occupying the Property on or about the first of each month, from prior to the commencement of his bankruptcy case through at least July 2020 (id. at ¶ 34).

19. Ms. Richardson does not contribute to the payment of the mortgage (id. at ¶ 38).

20. The Debtors' divorce was pending through at least July 2020, and nothing in the record of these bankruptcy cases indicates they have entered into an agreement to divide the marital assets or that the Vermont Family Court has issued a property division order with regard to the Property (id. at ¶¶ 27, 30–31).

21. At no time prior to their bankruptcy petition filings did either of the Debtors acquire title in other real property (id. at ¶ 29).

22. The Debtors each list the Property as an asset on their respective bankruptcy schedules and claim a homestead exemption of $62,419.54 with respect to the Property (case # 19-10525, doc. # 35, ¶ 15; doc. ## 1, 6; case # 19-10526, doc. ## 1, 6).

23. In response to questions at a § 341 meeting of creditors, Mr. Richardson testified he hopes to return to the Property someday (case # 19-10525, doc. # 35, ¶ 35).

24. In her bankruptcy schedules, Ms. Richardson lists an interest in Sjolander Family Farm, LLC (the "LLC"), and states she "expect[ed] to have income from farming operations begin[n]ing in [Spring] 2020." However, Ms. Richardson is a not a member of the LLC, and her interest is in the form of an informal agreement to use her milk market share to help the LLC ship milk. As of July 2020, Ms. Richardson has a full-time job at a local bank. Mr. Sjolander is the sole member of, and registered agent for, the LLC, which has a mailing address of 210 Coffin Road, St. Johnsbury, Vermont (case # 19-10525, doc. # 35, ¶¶ 40–44; case # 19-10526, doc. # 6, pp. 9, 24).

*Mr. Richardson's Tools of the Trade Exemption*

25. Mr. Richardson acquired a Polaris Razor all-terrain vehicle (the "Polaris") in 2018, which he still owned when he filed his bankruptcy petition in December 2019. At the time he acquired the Polaris, Mr. Richardson already owned another all-terrain vehicle (the "Older ATV") (case # 19-10525, doc. # 53, ¶¶ 1–5, doc. # 59).

26. Mr. Richardson used the Older ATV and the Polaris in his dairy operation at the Richardson Farm (id. at doc. # 53, ¶ 4, doc. # 59).

27. Mr. Richardson has been sugaring since 2011 and has used both the Older ATV and the Polaris for that activity. He uses the Polaris primarily for sugaring, but he sometimes uses it for recreational purposes as well (id. at doc. # 35, ¶¶ 49–50, doc. # 53, ¶¶ 5–6, doc. # 59).

28. Mr. Richardson owns three sugaring pans that he uses in connection with sugaring, but otherwise uses his parents' sugaring equipment and does not own his own sugaring house. Since spring 2019, Mr. Richardson has done sugaring on his mother's property in exchange for payments to his mother (id. at doc. # 35, ¶¶ 50, 55, doc. # 54, p. 11, doc. # 64).

29. In the fall, Mr. Richardson uses the Polaris to carry chain saws and other tools into the woods for sap line maintenance, to clean up downed trees on sap lines, and to repair sap lines. In the spring,

5

|   |   |
|---|---|
|   | Mr. Richardson uses the Polaris to remove taps and for other general maintenance and upkeep of his sugaring operation. The sugar bush is not accessible by car or truck during the sugaring season because the road is not plowed in the winter, and Mr. Richardson uses the Polaris for transportation to and from the sugar house on a daily basis (id. at doc. # 35, ¶¶ 51–54). |
| 30. | Mr. Richardson would not have purchased the Polaris if he could not have used it for sugaring (id. at doc. # 53, ¶ 7, doc. # 59). |
| 31. | In his bankruptcy schedules, Mr. Richardson lists the Polaris and sugaring equipment as assets and claims a tools of the trade exemption of $1,750 with respect to the Polaris and of $3,250 with respect to the sugaring equipment (id. at doc. # 35, ¶¶ 47–48, doc. # 6, pp. 6, 9, 11–12). |
| 32. | In his statement of financial affairs, Mr. Richardson identifies connections to two dairy farm businesses, the Richardson Farm and Ms. Richardson's operation at the Gebbie Farm. Mr. Richardson does not disclose any interest in a sugaring business on his statement of financial affairs or disclose any income from sugaring in his schedules (id. at doc. # 35, ¶¶ 22, 56–59, doc. # 6, pp. 35–36). |
| 33. | At the time he filed his bankruptcy petition in December 2019, Mr. Richardson was unemployed and had no employment income. Mr. Richardson stated in his schedules that he "was laid off from his truck driving work in early December[] 2019" and he expected to "return to work in April" (id. at doc. # 35, ¶¶ 45–46, doc. # 6, p. 25). |

## THE BURDEN OF PROOF

In the context of a motion for summary judgment, the moving party bears the burden of showing that no genuine issue of material fact exists. See Vermont Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004). Since the Parties have filed cross-motions for summary judgment, each party bears the burden of showing there are no material facts in dispute, and summary judgment is proper.

If that hurdle is met, and the Court turns to adjudicating which party is entitled to judgment as a matter of law, the Bankruptcy Rules are clear that the substantive burden of proof is on the party objecting to the Debtors' exemptions:

> (c) BURDEN OF PROOF: In any hearing under [Bankruptcy Rule 4003], the objecting party has the burden of proving that the exemptions are not properly claimed. After hearing on notice, the court shall determine the issues presented by the objections.

Federal Rule of Bankruptcy Procedure 4003(c) (2021). Accordingly, the Gebbies have the burden of proving the Debtors are not entitled to their respective homestead and tools of the trade exemptions and, thus, that they are entitled to judgment, as a matter of law.

## DISCUSSION

The Gebbies ask the Court to grant judgment sustaining their objections to both the homestead and tools of the trade exemptions the Debtors have claimed, under 27 V.S.A. § 101, and § 2740(2), respectively. By contrast, the Debtors each seek summary judgment in their favor, declaring they are entitled to these claimed exemptions. In order to assess if the Parties have met the summary judgment standard, the Court must first identify the facts that are material to the allowance of each exemption.

### *THE GEBBIES' OBJECTION TO EACH DEBTOR'S CLAIMED HOMESTEAD EXEMPTION*

The Court begins its analysis with Vermont's statutory definition of a homestead exemption:

> The homestead of a natural person consisting of a dwelling house, outbuildings, and the land used in connection therewith, not exceeding $125,000.00 in value, and owned and used or kept by such person as a homestead together with the rents, issues, profits, and products thereof, shall be exempt from attachment and execution except as hereinafter provided.

27 V.S.A. § 101 (2021). There is significant case law, both in the Vermont state courts and this Court, construing the scope and applicability of this homestead exemption in a variety of fact patterns, and particularly the circumstances necessary to establish that a debtor's property is not eligible for exemption as their homestead. All of this jurisprudence relies on certain fundamental premises. In considering the cross-motions before it, the Court gives most weight to these four premises:

- First, exemption statutes are remedial in nature, and ought to be construed liberally in favor of debtors. In re Rommer, 549 B.R.72 (Bankr. D. Vt. 2016) (citing In re Detko, 290 B.R.494, 499 (Bankr. D. Vt. 2003); Mercier v. Partlow, 149 Vt. 523, 524 (1988).
- Second, once a property has become a homestead, it can lose its character, as a homestead, only through death, alienation, or abandonment. In re Brent, 68 B.R. 893, 896 (Bankr. D. Vt. 1987); accord, In re Mead, 489 B.R. 363, 371–72 (Bankr. D. Vt. 2013) (collecting cases).
- Third, the relevant consideration in determining whether the homestead has been abandoned is whether the debtor intends to return. In re Detko, 290 BR 494, 499 (Bankr. D. Vt 2003), citing In re White, 18 B.R. 95, 97 (Bankr. D. Vt. 1982); In re Estate of Wolff, 108 Vt. 54, 57 (1936); Thorp v. Wilbur, 71 Vt. 266, 270 (1899); and Whiteman v. Field, 53 Vt. 554, 556 (1881).
- Fourth, a debtor's intent to maintain or abandon the homestead must be determined in relation to the surrounding exigencies. In re Detko, 290 BR at 499 (Bankr. D. Vt. 2003), In re Brent, 69 BR at 896 (Bankr. D. Vt. 1987).

It is undisputed the Debtors purchased the Property and lived there, together, from December 2010 until their separation in November 2017 (UMF ¶¶ 1–5, 11), and it was their homestead during that period. Neither party asserts the Property lost its character as the Debtors' homestead through death or alienation.

7

Therefore, the next inquiry must be into the sufficiency of the undisputed facts to establish whether one or both of the Debtors have abandoned the Property.

> Typically, the homestead is abandoned when the debtor either sells the property or establishes a new homestead. When a homestead is no longer used as a homestead, however, regardless of whether another homestead has been acquired, the homestead has ceased to exist. On the other hand, if a debtor intends to return to the homestead, then the homestead has not been abandoned and remains exempt during the intervening absence. <u>The deciding consideration in determining whether the debtor's absence represents an abandonment of the homestead is whether the debtor has an intention to return</u>. A debtor's intent to maintain or abandon the homestead must be determined in relation to the surrounding exigencies. The law does not favor abandonment of a homestead.

<u>In re Mead</u>, 489 B.R. at 372 (citations omitted) (emphasis added); <u>see</u> <u>also</u> <u>In re Detko</u>, 290 B.R. 494 (Bankr. D. Vt. 2003) (surveying Vermont homestead abandonment cases).

The only undisputed facts which pertain at all to the abandonment question are these:

11. In November 2017, with few remaining common interests and the certainty of a divorce, Ms. Richardson found it impossible to continue to share the house with Mr. Richardson and vacated the Property. She did not want to leave the Property but found it difficult to cohabit with Mr. Richardson after deciding to divorce him. Ms. Richardson also decided it would be convenient to move closer to the Gebbie Farm, so she and a roommate rented a house about one mile from the Gebbie Farm (<u>id.</u> at ¶¶ 24, 36).

12. In November 2018, Ms. Richardson filed for divorce from Mr. Richardson, and in December 2018 the Vermont Family Court issued a temporary order that provided, <u>inter alia</u>, that "[n]either party may sell ... any real property ... owned by the parties in their joint names ... except by written agreement of both parties" (<u>id.</u> at ¶ 25; doc. # 35-3, p. 6).[4]

13. In November 2018, Ms. Richardson had to give up her shared rental because her roommate left, and she could not afford to pay the full rent. Mr. Richardson remained living at the Property and, as he now had a girlfriend who visited frequently, Ms. Richardson did not want to resume living at the Property with him. For these reasons, Ms. Richardson chose to move into a house at the Gebbie Farm (case # 19-10525, doc. # 35 at ¶ 26).

14. In August 2019, Mr. Richardson had difficulty meeting the mortgage, tax, and insurance expenses for the Property. Ms. Richardson was unable to contribute to the upkeep of the Property as the dairy operation at the Gebbie Farm was losing money. The Debtors agreed to temporarily rent the Property to a childhood friend of Mr. Richardson's who had approached him about needing a rental home. Mr. Richardson did not want to assume the role of landlord, but he was willing to temporarily rent the Property to a trusted friend. The rental income was only enough to pay the mortgage, taxes, and insurance (<u>id.</u> at ¶ 28).

---

[4] Although the Parties state in the joint stipulation of facts that Ms. Richardson filed for divorce in December 2017, this appears to be an error, as the exhibit complaint for divorce is dated November 27, 2018, and the exhibit interim domestic order is dated December 6, 2018 (<u>see</u> doc. # 35-3, pp. 5, 7).

15. In September 2019, Ms. Richardson moved to 210 Coffin Rd., St. Johnsbury, Vermont (id. at ¶ 39).

16. As of when the Parties filed their joint stipulation of facts in July 2020, neither of the Debtors lived at the Property. As of that time, Mr. Richardson was residing at 152 Town Forest Rd., Newport, Vermont, with his girlfriend, and Ms. Richardson was residing at 210 Coffin Rd., St. Johnsbury, Vermont, with her boyfriend, Karl Sjolander ("Mr. Sjolander"), with whom she had a son who was then eight months old (id. at ¶¶ 32–33, 39).

17. At no time since vacating the Property in November 2017 has Ms. Richardson lived at the Property (id. at ¶ 37).

18. Mr. Richardson has received, and continues to receive, rental income from the residential tenant occupying the Property on or about the first of each month, from prior to the commencement of his bankruptcy case through at least July 2020 (id. at ¶ 34).

19. Ms. Richardson does not contribute to payment of the mortgage (id. at ¶ 38).

20. The Debtors' divorce was pending through at least July 2020, and nothing in the record of this bankruptcy case indicates they have entered into an agreement to divide the marital assets or that the Vermont Family Court has issued a property division order with regard to the Property (id. at ¶¶ 27, 30–31).

21. At no time prior to their bankruptcy petition filings did either of the Debtors acquire title in other real property (id. at ¶ 29).

22. The Debtors each list the Property as an asset on their respective bankruptcy schedules and claim a homestead exemption of $62,419.54 with respect to the Property (case # 19-10525, doc. # 35, ¶ 15; doc. ## 1, 6; case # 19-10526, doc. ## 1, 6).

23. In response to questions at a § 341 meeting of creditors, Mr. Richardson testified he hopes to return to the Property someday (case # 19-10525, doc. # 35, ¶ 35).

None of these undisputed facts alone, nor all of these undisputed facts taken together, establish either that Mr. or Ms. Richardson did, or did not, intend to return to the Property. This is due in part to the complex circumstances, or exigencies, of these cases, including but not limited to, each Debtor's (i) inability to afford to maintain the Property, (ii) need for some distance from the other due to the marital tensions, and (iii) stated preference for remaining in the Property.

The only direct statement on this is Mr. Richardson's testimony at the § 341 meeting, at which he testified he "hope[d] to return to the Property someday" (UMF ¶ 23). However, as this Court recently observed in addressing cross-motions for summary judgment which turned, in part, on intent:

> The Court also treats as disputed any alleged facts that are recitations of a person's knowledge, intent, motive, or subjective feelings. "Summary judgment is particularly inappropriate where 'the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions.'" Cross v. United States, 336 F.2d 431, 433 (2d Cir. 1964) (subsequent citations omitted).

In re Birch Wood, Inc., 2020 WL 1987732, note 2 (Bankr. D. Vt. 2020); 2020 Bankr. Lexis 1139

Since the crucial inquiry here is whether one or both of the Debtors abandoned their homestead, and since whether the Debtors abandoned the Property depends on whether the Debtors intended to return, and since the Court has found the undisputed facts do not reveal whether the Debtors intended to return to the Property, summary judgment is not proper. Perhaps ironically, this conclusion is supported by both the Debtors and Gebbies arguing that this material fact is undisputed: the Gebbies argue that the undisputed facts show the Debtors did not intend to return and therefore abandoned the Property, and the Debtors both explicitly assert they did not intend to abandon the Property, see doc. #68 p.5 in case # 19-10256 and doc. # 53, p. 5 in case # 19-10525. The Court finds this constitutes a dispute of material fact and precludes entry of summary judgment. Accordingly, the Court will set a trial to consider the Partiers' evidence on the issue of whether the Debtors abandoned the Property and hence have lost their right to claim a homestead exemption.

*THE GEBBIES' OBJECTION TO MR. RICHARDSON'S CLAIMED TOOLS OF THE TRADE EXEMPTION*

The Vermont statute governing exemption of goods or chattel permits the exemption of "the debtor's interest, not to exceed $5,000.00 in aggregate value, in … tools of the profession or trade of the debtor[.] …" 12 V.S.A. § 2740(2). Again, in this summary judgment posture, the Court must first determine which facts are material to determining whether Mr. Richardson may exempt the Polaris all-terrain vehicle and sugaring equipment as tools of the trade. The Parties have cited, and this Court has found, a death of jurisprudence addressing the scope and application of this exemption, and particularly the definition of a debtor's "trade" to aid the Court in identifying the material facts of this inquiry.

When it considered an appeal on this issue, the Second Circuit offered this guidance:

> In enacting the pertinent statute, the Vermont legislature did not undertake to define the term 'tools of the trade,' and in the absence of any indication that it intended to limit the type of property that can qualify as such, we will look to the function or use of the property to determine if it is, indeed, a tool of the debtor's trade.

Parrotte v. Sensenich (In re Parrotte), 22 F.3d 472, 475 (2d Cir. 1994) (emphasis added). See In re Cook, 66 Bankr. 3, 5 (Bankr. W.D. Wis. 1985) (holding dairy cows are "specialized tools" of a dairy farmer's trade and concluding that the absence of limiting language in the federal "tools of the trade" exemption demonstrates Congress' intent that it not be limited). It then reversed the district court (Billings, J.), which had affirmed the bankruptcy court (Conrad, J.), and held that bulls fell within the tools of the trade exemption, because their function was to increase milk production on the chapter 12 debtors' dairy farm. In that case, the Second Circuit applied an expansive interpretation of the state exemptions:

> As the district court in Vermont has previously acknowledged, narrowly interpreting the 'tools of the trade' exemption 'punishes the farmer for being inadvertently dependent on expensive tools of the trade as compared to other trades more dependent on smaller hand tools.' Oliver v. Lussier, Civ. No. 85–228, slip op. at 4 (D. Vt. Dec. 6, 1985) (citations omitted)

10

Id, at 476.

There is a corresponding, and very similar, tools of the trade exemption under the bankruptcy code, see 11 U.S.C. § 522(d)(6), so the Court also considers authorities construing that exemption. With respect to that provision, the leading bankruptcy treatise has explained,"[that section] is designed to help preserve the debtor's means of earning a living." 4 COLLIER ON BANKRUPTCY ¶ 522.09 (16th 2020). The Court applies that same "means of earning a living" factor in discerning whether a tools of the trade exemption claimed under the Vermont statute may be allowed. In analyzing the federal exemption for tools of the trade, this Court has previously observed, "the exemption of any property as a tool of the trade must be based on the debtor's trade at the time of filing the petition in bankruptcy." In re Rule, 38 B.R. 37, 41 (Bankr. D. Vt. 1983) (Marro, J.) (citations omitted). Also of import is the question of how necessary does a tool or implement need to be, to satisfy the eligibility criteria of the tools of the trade exemption. On this point, our sister court has opined:

> To be necessary, the tool or implement need not be absolutely necessary; "it is enough that is reasonably necessary or convenient or suitable for the prosecution of the claimant's work or business advantageously and usefully." 59 N.Y. Jur. 2d, Exemptions § 15, at 18 (1987) (footnote omitted) (subsequent citations omitted).

In re de Kleinman, 172 B.R. 764, 774 (Bankr. S.D.N.Y. 1994) .

Here, it is undisputed Mr. Richardson used both the Polaris and the sugaring equipment in connection with sugaring as of the petition date (UMF ¶¶ 27–29). Moreover, the Parties do not appear to disagree with respect to the amount of the claimed exemption fitting within the statutory exemption cap. These are material facts and undisputed. However this is not enough.

Based on the foregoing caselaw, the Court concludes Mr. Richardson's eligibility for the claimed exemption turns on three additional material facts: (I) whether the sugaring business was part of Mr. Richardson's trade, on the date he filed his bankruptcy petition; (II) whether Mr. Richardson relied on the sugaring business to earn a living, as of the petition date; and (III) what impact, if any, does the farming nature of the Debtor's sugaring business have on how broadly the tools of the trade exemption should be construed here.

Since the Parties' undisputed facts regarding the tools of the trade exemption do not address these three material facts, the Court finds summary judgment is not proper. It will set a trial on the merits so the parties can present evidence as to these material facts.

## **CONCLUSION**

Based on the foregoing analysis and findings, the Court finds there are genuine disputes of material fact with respect to each of the claimed exemptions, and summary judgment is therefore not proper. Accordingly, the Court denies the Parties' cross-motions for summary judgment in their entirety and will set this matter for trial to determine the material facts in dispute and resolve the legal issues

presented in this contested matter.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law.

January 19, 2021  
Burlington, Vermont

Colleen A. Brown  
United States Bankruptcy Judge